## UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
#### ORLANDO DIVISION

**ROBERTO CARRERO LORENZO,**

      **Plaintiff,**

**-vs-**                                    **Case No.  6:10-cv-369-Orl-18DAB**

**COMMISSIONER OF SOCIAL
SECURITY,**

      **Defendant.**

_____

# Memorandum Opinion & Order

The Plaintiff brings this action pursuant to the Social Security Act (the Act), as amended, Title 42 United States Code Section 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (the Commissioner) denying his claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits under the Act.

The record has been reviewed, including a transcript of the proceedings before the Administrative Law Judge (ALJ), the exhibits filed and the administrative record, and the pleadings and memoranda submitted by the parties in this case.  Oral argument has not been requested.

For the reasons that follow, the decision of the Commissioner is **REVERSED and REMANDED.**

## I.     BACKGROUND

### A.     Procedural History

Plaintiff filed for a period of disability, DIB and SSI benefits on October 25, 2006, alleging an onset of disability on September 16, 2006, due to blindness in the left eye, diabetes mellitus, high blood pressure, bipolar disorder, and depression.  His application was denied initially and upon

reconsideration.  R. 72-77, 79-83.  Plaintiff requested a hearing, which was held on May 4, 2009,

before Administrative Law Judge Philemina Jones (hereinafter referred to as "ALJ").  R. 23.  In a

decision dated June 5, 2009, the ALJ found Plaintiff not disabled as defined under the Act through

the date of the decision.  R. 15-23.  Plaintiff timely filed a Request for Review of the ALJ's decision,

which the Appeals Council denied on January 14, 2010.  R. 1.  Plaintiff filed this action for judicial

review on March 9, 2010.  Doc. 1.

### B.      Medical History and Findings Summary

Plaintiff was 43 years of age on the date of the ALJ's decision.  R. 23.  He had a high school

education and had past work experience as a body shop manager, janitor and service manager.  R. 22.

Plaintiff's medical history is set forth in detail in the ALJ's decision.  By way of summary,

Plaintiff complained of retinopathy and detachment in the left eye, diabetes mellitus, vision problems

in the right eye, headaches, chest pain from high blood pressure, pain in the kidney, bipolar disorder,

and depression.  R. 45-46, 48-49, 57, 64, 66, 68, 70.  After reviewing Plaintiff's medical records and

Plaintiff's testimony, the ALJ found that Plaintiff suffered retinopathy and blindness in the left eye,

diabetes mellitus associated with neuropathy, obesity and depressive disorder, which were "severe"

medically determinable impairments, but were not impairments severe enough to meet or medically

equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  R. 17-18.  The ALJ

determined that Plaintiff retained the residual functional capacity (RFC) to perform sedentary work,

as he could lift ten pounds occasionally and less than 10 pounds frequently, sit six hours and stand

or walk two hours in an eight-hour workday, with additional limitations.  R. 19.  In making this

determination, the ALJ found that Plaintiff's allegations regarding his limitations were not credible

to the extent they were inconsistent with the RFC assigned by the ALJ.  R. 20.  Based upon Plaintiff's

RFC, the ALJ determined that he could not perform past relevant work.  R. 22.  Considering

Plaintiff's vocational profile and RFC, the ALJ applied the Medical-Vocational Guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2, and, based on the testimony of the vocational expert ("VE"), the ALJ concluded that Plaintiff could perform work existing in significant numbers in the national economy as a call out operator and order clerk. R. 23.  Accordingly, the ALJ determined that Plaintiff was not under a disability, as defined in the Act, at any time through the date of the decision.  R. 23.

Plaintiff now asserts four points of error.  First, he argues that the ALJ erred by failing to incorporate Plaintiff's inability to communicate effectively in English into the hypothetical question posed to the VE.  Second, Plaintiff contends the ALJ erred by minimizing his mental limitations and omitting his bipolar disorder with psychotic tendencies.  Third, he claims the ALJ erred by relying on VE testimony that Plaintiff could perform occupations that required greater reasoning requirements than those required for the performance of "simple, routine, repetitive" work.  Fourth, he asserts that the Appeals Council (AC) erred in failing to remand Plaintiff's case based on new and material evidence – a second psychiatric hospitalization two months after the Commissioner's decision was rendered – showing that Plaintiff's mental impairment remained significantly limiting after his psychiatric hospitalization in May 2008.

Because the Court finds that the ALJ's decision as Plaintiff's ability to communicate in English and the AC's failure to remand based on the second psychiatric hospitalization were not based on substantial evidence[1], the decision of the Commissioner is  is **REVERSED and REMANDED**.

## II.   STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  The

---

[1]The Court will require that the other issues raised by Plaintiff be addressed by the ALJ on remand as well.

Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – *i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11th Cir. 2004).  "We may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner.]" *Id.* (internal quotation and citation omitted). *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

The ALJ must follow five steps in evaluating a claim of disability.  *See* 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, he is not disabled.  20 C.F.R. § 404.1520(b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled.  20 C.F.R. § 404.1520(d).  Fourth, if a claimant's impairments do not prevent his from doing past relevant work, he is not disabled.  20 C.F.R. § 404.1520(e).  Fifth, if a claimant's impairments

(considering his residual functional capacity, age, education, and past work) prevent his from doing

other work that exists in the national economy, then he is disabled.  20 C.F.R. § 404.1520(f).

## III.     ISSUES AND ANALYSIS

### A.     New and material evidence

Plaintiff contends that the Appeals Council erred in failing to remand Plaintiff's case based

on new and material evidence – including a second psychiatric hospitalization dated only two months

after the Commissioner's decision was rendered – that establishes that Plaintiff's mental impairment

remained significantly limiting after his psychiatric hospitalization in May 2008.  The Commissioner

argues that Plaintiff's hospitalization for psychiatric care from August 25 to 30, 2009 (R. 426-59), two

and a half months after the ALJ's decision of June 5, 2009, is not chronologically relevant.

"Material" evidence is evidence that is "relevant and probative so that there is a reasonable

possibility that it would change the administrative result." Milano v. Bowen, 809 F.2d 763, 766 (11th

Cir. 1987) (quotation omitted). When evidence is submitted for the first time to the AC, that new

evidence becomes part of the administrative record. *Keeton v. Dep't of Health and Human Servs.,* 21

F.3d 1064, 1067 (11th Cir. 1994). The AC considers the entire record, including the new, material,

and chronologically relevant evidence, and will review the ALJ's decision if the ALJ's "action,

findings, or conclusion is contrary to the weight of the evidence currently of record." 20 C.F.R.

§ 404.970(b). When a plaintiff submits additional evidence to the Appeals Council and the Appeals

Council denies review, the court must determine whether the Commissioner's decision is supported

by substantial evidence on the record as whole. *See Ingram v. Commissioner of Social Security*, 496

F.3d 1253, 1262, 1266 (11th Cir. 2007); *Hummel v. Astrue*, No. 8:06-CV-725-T-EAJ, 2007 WL

2492460, *7 (M.D. Fla. Aug. 30, 2007) (under *Ingram*, the court reviews whether the decision to deny

benefits is supported by substantial evidence in the record as a whole, including evidence submitted

to the Appeals Council).  The district court is charged with reviewing "whether the new evidence renders the denial of benefits erroneous." *Ingram*, 496 F.3d at 1262.

Plaintiff had a series of physical problems including uncontrolled hypertension and diabetes, diagnosed at least by 2005, and subsequent blindness in his left eye, which preceded his mental health problems in 2008. R. 310-315.  Plaintiff was diagnosed with diabetic nephropathy, hyperlipidemia, obesity, and diabetic peripheral neuropathy.  Plaintiff had been out of medications, but stated that his blood sugars had been high even with medication.  R. 284-289, 296-297.  In March 2006, Plaintiff described waking up with cob webs and visual acuity changes, including floaters and pain in the left eye, and he was diagnosed with hemorrhage in the left eye and possible tear and he was referred to a retina specialist. R. 276-77.   Dr. Sunil Malkani examined Plaintiff and found hypertension retinopathy, pteryguim of both eyes and vitreous hemorrhage of the left eye. R. 275.

Plaintiff was treated from September 2006 through January 2007 at Retina Consultants of Florida for vision loss; his visual acuity in his left eye was limited to "hand motion."  He was diagnosed with extremely large preretinal subhyaloid and vitreous hemorrhage of the left eye with the possibility of ruptured vessels secondary to the retinal vessel disease associated with hypertensive problems.  R. 300-08, 318.  Other studies showed he had hypertensive retinopathy as well as some mild diabetic retinopathy changes in his right eye.  R. 305.

He had surgery on October 5, 2006, for the hemorrhage and then surgery to repair a retinal detachment the problems in his left eye, but progress notes from October 16, 2006 show he still experienced a slight haze. R. 303.  He could not return to his normal work; by December 1, 2006, his visual acuity in the left eye was still limited to "hand motion" and his retina was flat. R. 300.  As of January 3, 2007, Plaintiff's haze in his left eye turned out to be a cataract. R. 318.  In February 2007, Plaintiff's right eye showed background diabetic retinopathy and the left eye showed a hazy view due

to cataract; he was told to return in four months for possible cataract surgery to help maximize his vision in the left eye.  R. 316-17.

On May 29, 2008, Plaintiff was admitted to Florida Hospital due to chest pain after being treated for depression and suicidal ideation at Park Place Behavioral Center and expressing having chest pain. R. 245-267.   On May 31, 2008, Plaintiff was involuntarily committed ("Baker-Acted") at the Park Place Behavioral Center crisis stabilization unit for suicidal thoughts with plans to hang himself; he reported audio and visual hallucinations, hopelessness, helplessness, lack of motivation, insomnia, overeating; his affect was expressionless, and he had poor insight and judgment.  R. 339-364.  Plaintiff was diagnosed with major depressive disorder, severe with psychotic features, and was assigned a Global Assessment of Functioning ("GAF") of 30[2]. R. 339-364.  He reported avoiding medical treatment due to finances; he was admitted and started in individual, group counseling, and psychosocial rehabilitation for six months and was prescribed to treat depression and bipolar mania; Plaintiff was discharged from inpatient care on June 3, 2008. R. 339-364, 370-383, 461.

Six weeks later, due to lack of resources, Plaintiff reported being unable to afford medications. R. 375.  He was diagnosed with rule out bipolar disorder and major depressive disorder and was assigned a GAF of 45[3].  By mid-August 2008, Plaintiff reported no relief from his medications and he was angry all the time, still hearing voices. R. 374.  As of August 21, 2008, he still reported being more depressed, thoughts of suicide, and he had been tasered and taken to jail for battery; he was diagnosed with bipolar I disorder.  R. 373.  Plaintiff was started on new medication for bipolar

---

[2]The Global Assessment of Functioning Scale ("GAF") ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, or unable to care for self). Diagnostic and Statistical Manual of Mental Disorders--Fourth Edition ("DSM-IV) at 32. A score between 21 and 30 is defined as having behavior that is considerably influenced by delusions and hallucinations or serious impairment in communication or judgment or an inability to function in almost all areas.

[3]A GAF score between 41 to 50 is defined as manifesting "serious symptoms" (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job. DSM-IV at 32.

disorder but despite the medication changes, he was still reporting not sleeping, racing thoughts, hearing voices, anger, and irritability. R. 370-372.   Plaintiff continued to receive treatment for his mental health disorder between February and April 2009, but he still experienced insomnia, anger and anxiety. R. 409-412.   He was diagnosed with bipolar disorder type I manic with psychotic features and was told to add another medication to his regimen. R. 411.

Plaintiff's hearing before the ALJ was held on May 4, 2009; the ALJ issued her decision on June 5, 2009.   R. 23, 31.   Plaintiff's counsel submitted records to the AC from June 2009 to September 2009 for Plaintiff's mental health treatment at Park Place Behavioral Center for depression and bipolar disorder. R. 427-461.   Plaintiff was readmitted to Park Place Behavioral Center crisis stabilization unit from August 25, 2009 to August 29, 2009 due to depression and suicidal ideation. He reported having depression for more than two years (R. 446), and visual and audio hallucinations "for several months," with voices telling him to harm himself and his family; he also exhibited poor insight and judgment, violent temper, racing thoughts, and memory impairments, and depressed mood. R. 427-38, 454-55.   He was diagnosed with bipolar disorder most recent episode manic, severe with psychotic features, and assigned a GAF of 30.   R. 454-55.   At discharge on August 30, 2009, he was assigned a GAF of 55. R. 439.

In the ALJ's decision, she determined that Plaintiff had experienced "no episodes of decompensation which have been of extended duration," although she did note that the claimant was hospitalized involuntarily due to suicidal ideations and audio/visual hallucinations, with a GAF of 35 at the time.   R. 18.   She noted that "several days later his condition greatly improved[4] and he was discharged home after successfully completing the program."   R. 18-19.   "Because his commitment

_____

[4]The Court does not find in the mental health records any notation that Plaintiff had "greatly" improved before he was discharged, although the notes do reflect he felt better and wanted to go home.   R. 363.

-8-

only lasted a few days, the undersigned finds that the claimant has not experienced episodes of decompensation of extended duration." R. 19.

The Commissioner argues, from a very technical standpoint, that because the records are not of Plaintiff's condition before June 5, 2009 when the ALJ issued her decision, they are not relevant. The Commissioner cites Plaintiff's discharge form in which a mental health provider checked the box that says Plaintiff's "presenting condition greatly improved" and "this place helped me with my depression" (R. 439).   The Commissioner argues that Plaintiff was not diagnosed with any new conditions and his recommended treatment and prognosis remained the same (R. 439) and nothing in the new evidence indicates Plaintiff could not perform simple, routine, and repetitive tasks or that he had additional limitations on his ability to work.

Plaintiff argues that his submission of the Park Place Behavioral Center progress notes dated around the time of the ALJ's decision (June 2009) and the medical records of a second psychiatric hospitalization just two months after the ALJ's decision directly refute the ALJ's conclusion that Plaintiff's condition was barely limiting after his hospitalization in June 2008.   Plaintiff argues that his hospitalization a second time for suicidal ideation one year after the previous admission based on declining symptoms and suicidal ideation, anger, and hallucinations indicates that his mental health condition did not improve, but deteriorated. The subsequent treatment also indicates that Plaintiff *was* diagnosed with a new condition – bipolar disorder – not just depression.  He argues that the new records refute the ALJ's minimization of Plaintiff's mental impairment and its severity, and the AC erred in failing to remand his case to the ALJ given the new and material evidence that his condition was more severe and limiting than as determined by the ALJ.

The Court finds that the mental health records submitted to the AC are new and material evidence that relate to Plaintiff's mental state during the time period in question (September 2006 to

-9-

June 2009), and diagnose an additional serious condition – bipolar disorder.  Moreover, the ALJ did not find Plaintiff's mental condition to be serious enough to order a consultative examination. Therefore, the ALJ's decision was not based on substantial evidence, and the case is **REVERSED** and **REMANDED** for the ALJ to consider the 2009 Park Place Behavioral Center records, obtain updated records, request a mental RFC assessment from the treating mental health physician, and order a consultative examination if necessary; the ALJ will also be required to reflect the appropriate mental limitations in any hypothetical to the VE.

### B. Plaintiff's Literacy in English

Plaintiff contends that the ALJ erred in failing to resolve inconsistencies in the evidence as to the extent of Plaintiff's ability to communicate in English and in failing to incorporate Plaintiff's inability to communicate effectively in English into the hypothetical question posed to the vocational expert.  Plaintiff contends that these failures were significant because the two occupations listed by the vocational expert (call-out operator and order clerk) require frequent speaking and at least Level Two language skills. The Commissioner contends that substantial evidence supports the ALJ's determination that Plaintiff speaks English and is literate within the meaning of the Social Security Administration's regulations because Plaintiff has at least a high school education[5] (R. 36), and completed a class in automobile body work (R. 36), thus, he is literate.

A claimant's literacy in Spanish is irrelevant to his ability to find sedentary work in America, where English is the dominant tongue. *Zayas v. Heckler*, 577 F. Supp. 121, 127 (S.D. N.Y. 1983). "This is a nation of immigrants, where hundreds of languages and dialects are spoken. It would be an impossible administrative task for the Secretary to designate jobs specifically for the many claimants who are unable to read or write English, yet are literate in one of the numerous languages spoken in

---

[5]There is at least one reference in the record to Plaintiff being raised in Puerto Rico; it is not clear whether he graduated from high school there as well.

the United States." *Id.* (holding claimant to be disabled).  The term "illiteracy" for Rule 202.01 means

illiteracy in English, not illiteracy in all languages.

> The Social Security Regulations state:
>
> The term "education" . . . includes how well you are able to communicate in English,
> since this ability is often acquired or improved by education. . . . Illiteracy means the
> inability to read or write. . . . Because English is the dominant language of the country,
> it may be difficult for someone who doesn't speak and understand English to do a job,
> regardless of the amount of education the person may have in another language.
> Therefore, we consider a person's ability to communicate in English when we evaluate
> what work, if any, he or she can do. It generally doesn't matter what other language
> a person may be fluent in. . . . We will ask you how long you attended school and
> whether you are able to speak, understand, read and write in English.

20 C.F.R. § 404.1564(b).  It is the Commissioner's burden to establish that a claimant is literate.

*Silveira v. Apfel,* 204 F.3d 1257, 1261-62 n.14 (9th Cir. 2000).  One of the educational levels specified

in the Grid Rules is "[i]lliterate or unable to communicate in English." See generally 20 C.F.R. Pt.

404, Subpt. P, App. 2. The two concepts are separately defined for purposes of the regulations.

"Illiteracy means the inability to read or write." 20 C.F.R. § 404.1564(b)(1). Someone is considered

"illiterate if the person cannot read or write a simple message such as instructions or inventory lists

even though the person can sign his or her name."  *Id.* The regulations indirectly define ability to

communicate as "the ability to speak, read and understand English." 20 C.F.R. § 404.1564(b)(5). In

general, the Social Security Administration regards the illiterate as a subcategory of those who are

unable to communicate in English.  *See* Social Security Acquiescence Ruling 86-3(5) at *2, available

at 1986 WL 68649 ("Illiteracy is subsumed under inability to communicate in English.").

In this case, the ALJ found – without any elaboration – that Plaintiff is able to communicate

in English and had at least a high school education.  R. 22.   Plaintiff argues that the evidence strongly

indicates he is unable to communicate in English which is why an interpreter had to be present at the

hearing.  R. 31.  During the hearing, the ALJ asked Plaintiff if he could "speak any English at all" and

he replied, "No. Very Little." R. 31. Plaintiff argues that his testimony that he spoke very little English, at a minimum, required the ALJ to resolve any inconsistencies in the record.

Plaintiff also contends that the ALJ did not even acknowledge the presence of an interpreter at the hearing in her decision and the ALJ's failure to even acknowledge the fact that an interpreter was necessary to conduct the hearing illustrates the ALJ's lack of analysis of the issue. R. 15. Plaintiff points to the ALJ's listing of the VE, the claimant, and the claimant's non-attorney representative being present, but there is no mention of the interpreter even though an interpreter had to be present for Plaintiff to participate.  R. 31.  Plaintiff argues that the ALJ's notation that Plaintiff "claimed" he could not read was not supported by any findings of fact as to her resolution of his credibility on this issue

The Commissioner argues that an ALJ is not required to summarize the entire record before her in the written decision, and in this case because the ALJ specifically found Plaintiff had at least a high school education and was able to communicate in English (R. 22 Finding 8), no other discussion was necessary.  Doc. 19 (citing *Dyer*, 395 F.3d at 1211 ("[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision."). The Commissioner concedes that a Spanish interpreter was used at the hearing, but argues that Plaintiff has a high school education, having completed through the 12th grade, and a class in automobile body work (R. 36). The Commissioner also advances a couple of theories that the ALJ did not discuss: that Plaintiff's ability to communicate in English is adequate because he has completed and signed several questionnaires in English concerning his purported pain (citing R. 189-91, 206-08) and Plaintiff's medical records are devoid of any indication Plaintiff had difficulty communicating his symptoms, complaints, or medical history to his treating sources (R. 275-461).

As an initial matter, general principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ. *See SEC v. Chenery Corp.,* 318 U.S. 80, 93-95, 63 S.Ct. 454, 87 L.Ed. 626 (1943); *Steele,* 290 F.3d at 941; *Golembiewski v. Barnhart,* 322 F.3d 912, *916 (7th Cir. 2003); *Pinto v. Massanari,* 249 F.3d 840, 847-48 (9th Cir. 2001); *Fargnoli v. Massanari,* 247 F.3d 34, 44 n. 7 (3d Cir. 2001). The Commissioner's decision "must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Knipe v. Heckler*, 755 F.2d 141, 149 n. 16 (10th Cir. 1985).  The ALJ did not discuss why she determined that Plaintiff could communicate in English, other than to list it as Finding No. 8.  R. 22.

Plaintiff argues that the ALJ could not discount his inability to communicate in English based on the completed forms, because his family and his representative assisted him in completing the forms. R. 20.  At the time Plaintiff applied for disability benefits, a member of the SSA staff, a claims representative, noted that Plaintiff had "difficulty communicating because he understood little English" and that his daughter answered most of the questions. R. 171.

The Commissioner puts much weight on Plaintiff's Disability Report which was completed when he applied for benefits, indicating that he could speak, understand, read, and write English (R. 173).  Plaintiff concedes that the form indicates that the person completing the form can speak, read, and write in English, but this document was not signed and it is not clear who actually even filled out the form and whether anyone reviewed the contents with Plaintiff. R. 173-180.  As Plaintiff's counsel points out, it appears Plaintiff did not complete the form because some of it is written from the perspective of a third person (as opposed to the writer actually being Plaintiff), *i.e.*, where it says "Claimant has had numerous test.  He advised that they will be listed in his medical records." R. 180.  It is obvious to the Court even on a superficial level that Plaintiff's handwriting from his signature

on one of the forms (R. 189-91) is completely different from the handwriting of the person, Jessica

Guzman, who completed at least one of the disability forms for him in English on the same day.  R.

181-88.

In this case, even if the ALJ had relied on the way in which Plaintiff's forms were completed

in English, without more, it is not probative of his literacy in English, where he had assistance

completing the forms, and Plaintiff testified through an interpreter at the hearing.  *See Lugo v. Chater*,

932 F.Supp. 498, 502 (S.D. N.Y. 1996) (a brief conversation with the claimant is not probative of her

English speaking ability, particularly where an interpreter is used).

Plaintiff also argues that the ALJ erroneously failed to include English communication

limitations in the hypothetical question which requires reversal and remand.  The Commissioner

argues that "language" is part of "education," so when the ALJ described in the hypothetical a

younger individual "who has the *education* and past relevant work as described for the Claimant" (R.

54), she implicitly included Plaintiff's ability to communicate in English in the hypothetical.

The Plaintiff is correct that case law in this circuit requires that the ALJ employ hypothetical

questions which are accurate and supportable on the record and which include all limitations or

restrictions of the particular claimant.  *Pendley v. Heckler*, 767 F.2d 1561 (11th Cir. 1985).  Where the

hypothetical employed with the vocational expert does not fully assume all of a claimant's limitations,

the decision of the ALJ, based significantly on the expert testimony, is unsupported by substantial

evidence.  *Id*.  at 1561 (quoting *Brenam v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980)).  Applicable

regulations obligate ALJs to evaluate a claimant's ability to speak, understand, and read and write in

English when evaluating what work the claimant can perform.  20 C.F.R. § 404.1564(b)(6).

Plaintiff argues that the ALJ was required to include Plaintiff's inability to communicate in

English and/or illiteracy in English into the hypothetical question to the VE, and the ALJ erred in

failing to include any language limitations in the VE's hypothetical question. Particularly since the two occupations the VE suggested in response to the ALJ's hypothetical – order clerk and call-out operator – require frequent and significant speaking in English[6], Plaintiff argues he would not be able to perform the two cited occupations.

The ALJ in her decision omitted any reference to Plaintiff's stated inability to speak English and never inquired as to his ability to read and write in English, nor did she propose any language limitations in the hypothetical to the VE. Therefore, the ALJ's decision was not based on substantial evidence, and the case is **REVERSED** and **REMANDED** for a finding on the issue of Plaintiff's literacy and ability to perform other work in the economy with the appropriate limitations for literacy and education.

### IV.    CONCLUSION

For the reasons set forth above, the Commissioner's decision is **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for a finding on the issue of Plaintiff's literacy and ability to perform other work in the economy with the appropriate limitations for literacy and education, and for consideration of new and material evidence. The Clerk of the Court is directed to enter judgment consistent with this opinion and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on July 7, 2011.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record

---

[6]According to the DOT descriptions, Level Three (call-out operator) and Level Two (Order Clerk) language skills require the ability to read and write and the jobs require frequent speaking. Doc. 18-1, 18-2.

-15-